Rome v. Development Alternatives, Mr. Walsh. Good morning, Your Honors. May it please the Court, my name is Donald Walsh. I'm here on behalf of Ms. Rome. I apologize in advance that my case doesn't have the sexy constitutional issues that you previously heard this morning. My case is more about facts. It's very factually driven. We have a situation where there was a true injustice that occurred at the district court level in this particular case in granting summary judgment against Ms. Rome. This case is a case all about retaliation. That's really the only thing that we're up here about. There are three very simple factors that are relevant to any retaliation claim. First thing is the plaintiff has to engage in protected activity. Fortunately, the district court below held that Ms. Rome did, in fact, engage in protected activity. So that's not even before the court at this point. The only other two factors that are relevant are was there a materially adverse action that was taken by the employer and then is there a causal connection between the two. And in this case, the judge found both that there was no material adverse action and he found that there was no causal connection. And I believe that both of those conclusions were against the tremendous weight of the evidence, not to mention they clearly violated the standards under a motion for summary judgment. We have a situation where a material adverse action that the court has made perfectly clear is one where you basically have some significant impact to the status of the employment. It can be hiring. It can be firing, failing to promote, some sort of odd change in the benefits or the status that this particular individual would have had. In this case, we think that beyond doubt there was no question that Ms. Rome had a material adverse action. She was employed in Venezuela in a position where she was the assistant COP, sort of almost a vice president under South American standards for DAI. In that situation, she suddenly was told after coming forward at HR's urging, at management's urging to talk about what she saw as deplorable conduct, she was ripped from her position and told, you know what, it's no longer going to be perfect for you down there. Come back to headquarters in Bethesda. Well, this is a situation where there's no doubt that under the case law that exists at this point in time, we clearly had an adverse action. It substantially impacted her employment in this case. We had a situation where she was ripped from her home of four years down in Venezuela. She was taken out of her job and told to go back to Bethesda with no job at all on the horizon in Bethesda for her. All that she was told was you can go back to Bethesda and you can hunt for another job. What about the causation point? That seems to me at least a little bit more difficult for you. What about the causation point? Your Honor, causation is an interesting fact. And I think that part of the issue that happened with our summary judgment case in this was that the Nassar case was decided by the Supreme Court literally on the eve of our hearing for summary judgment in this case. And I think the court kind of got caught up in what the causal element was and what it is that you have to prove. Nassar now says it has to be a but-for cause of action. You have to but-for cause action in order to show that the adverse action and the protected activity are combined, that somehow they're linked together at that point in time. In this case, you can prove causation a variety of ways, circumstantially, just based on time alone, or by direct evidence. We think in this case, Your Honor, we've demonstrated beyond a doubt that there's not only a temporal component that clearly was met in this case, but there also was direct evidence of the causation. Ms. Roome came forward in January of 2008 to describe this behavior. At management's urging, she talked to HR. Within a month of that, HR found that the activities that she had identified, including talking to the individual that was under investigation, that clearly it was beyond all acceptable bounds of what they acknowledged was acceptable behavior in that case. No doubt at all. A month later, another investigation takes place, continuing the investigation, trying to look into this. Ms. Roome leaves. One of the things that concerns me is that these things that are nothing more than personality conflicts are transmuted into discrimination suits. And it seemed to me, Your Honor, I've read the record fairly carefully, and it seemed to me that part of the problem here, part of the reason that she was let go, is that she and Fernandez, they just couldn't get along. And then when Upton Kutzulek was brought in as a replacement, that she and Fernandez did get along. And so if you've got a supervisor who can't get along with one individual,  but he can get along with another individual, that's going to work. I mean, we all want to be part of a team that has some good human chemistry about it. And it seems that the human chemistry between Roome and Fernandez was bad, and the human chemistry between Upton Kutzulek and Fernandez was much better. That's only part of it, but that's what you get the impression with. Two people had a lot of personality conflicts, and two other people got along really well. Your Honor, that would be absolutely correct, except for if you look at when that controversy started, was when Ms. Roome came forward to HR at HR's urging and started to complain about these behaviors that she had witnessed. That's when the personality, that's when the whole chain of events started. It's no question that there was a personality conflict. The question is why was there a personality conflict. That personality conflict started when Ms. Roome came forward to talk about what she believed was illegal behavior, what HR found was illegal behavior. And Ms. Upton Kutzulek even indicated that she lied to Mr. Fernandez to avoid getting into trouble, to avoid having those personality conflicts. They didn't dismiss her immediately. The precipitating event for the dismissal was that they, as far as I know, they would have taken her back, but she had some medical difficulties. I'm not sure what exactly they were, but they kept her out of work for a good bit of time. Initially, the doctor sent in a note on June 5th and saying she's going to be able to return to work on June 25th. And then she initially maintains in her deposition that, yes, she could have come back on the 25th. But then on July 31st, the attorney sends a letter to DAI and said, you are incorrect that Roome is able to resume work. Medical complications. She's still not been released for work. And then there's a doctor's note August 25th saying that Roome still can't come back to work because she's in a doctor's care. Now, there's this back and forth, but it's not clear when and if she will ever be able to return to work. And I don't think that the company is obliged to hold the job open indefinitely when it's hard to get answers and she's not returning to work and when the temporary replacement is working out. I don't know what all of the medical situation is, but why should a company just hold a post open indefinitely when they don't know if someone's going to return to work when there's a temporary replacement who's working out great? And I'm not sure that there was room in the office for a third permanent non-Venezuelan staffer. Your Honor, I think that what's happening is that you're getting caught up in the same sort of post hoc analysis that the judge, the district court did below as well. The adverse action occurs. These are doctor's notes and all the rest. I understand that, Your Honor, but the problem is when did the adverse action happen? The adverse action happened at the beginning of May before Ms. Rome said one word about having a health issue. At the beginning of May, DAI internal documents... Why in June and July were they still anxious to find out if she could come back to work? I suspect that they were attempting to try and create a defense that they could use later in time, Your Honor. We have a situation where there's no doubt that at the beginning of May, even by May 15th, her supervisors say she's not coming back. Medical issues weren't raised then. What is the adverse action? They completely removed her from her job in Venezuela, told her it's the equivalent she could go back and find. Is it a replacement of Rome by Upton, that's the adverse action? Or is it a transfer proposal? Which one is it? It'd be both, Your Honor. They didn't transfer her. They removed her from the position, said you can come to Bethesda and hunt for a job. It'd be the equivalent of taking any one of the judges here and saying, go to the Capitol building, look for a job. That's what they did with Ms. Rome in this case. They said, you're no longer needed here, it's not perfect for you anymore, come back to Bethesda and look for a job. But if she'd been able to return to Venezuela in June, in July, when all the correspondence was going on, there's no indication that they would have declined to take her. They did indicate that, Your Honor. They said it's no longer perfect for you, don't come back. All the correspondence in May said, Ms. Rome, you don't have a position here anymore. We're replacing you. So why was there all the interest in having her come back to work? I believe, Your Honor, it was an attempt to try and mitigate against this lawsuit, the same lawsuit that HR said would happen because of Mr. Fernandez's behavior. HR predicted this lawsuit was coming in January of 2008 when they first investigated this and said that Mr. Fernandez's activities will, in fact, lead to a discrimination claim against this company. Leaving aside your argument about a constructive discharge for just a moment, I know you're making it, as to the actual termination for medical reasons, do you argue that that was improper? I don't believe she was terminated for medical reasons, Your Honor, at all. I believe that what happened was they— I'm saying if that's true, if the company were to say, we terminated her because you heard the litany, she can't come to work. If that's true, do you have a complaint about that? Do you have some factual complaint about that? The question would be what position did they terminate her from, Your Honor, because there was no position available to her at that point in time. They terminated her from employment with them. That's what they terminated her from. They said you're an employee in name only. We'll allow you to be a DAI employee. No, I'm not asking you to enter any more of that argument. I'm asking about the fact of the termination. And I call the termination not the constructive termination. I know you can argue that. But what I call the termination when they just, you no longer work for us. You stop getting a paycheck. The company asserts that was because she was medically unable to come back to work. Just on that, do you have any argument about that part of the case? Factually, no, Your Honor. Legally? Legally, I don't believe we do either at this point. We're not dealing with that situation. We're dealing with a situation where her position was in Venezuela, doing a job that she did very well by all accounts, and she was told this isn't perfect for you. If we were to find it wasn't a constructive discharge, do you lose the case then because you don't have any problem with the actual termination? Your Honor, I think the problem is I don't believe so. And the reason why is because you're confusing what's required in a retaliation claim is an adverse action. I'm not confusing anything.  I apologize. I'm not confusing anything. What's required? I'm asking if you don't, if we find there was not a constructive discharge, do you have any, that's what you said, you have no argument with the actual termination. Is that correct? Your Honor, if there is no constructive discharge, then yes, I believe at that point in time she's still considered an employee. She would have been considered an employee eventually. You didn't answer my question. I thought you'd already told me this. If there were to be found there's no constructive discharge, then you have no concern or complaint or claim as to the actual termination. If there's no constructive discharge. Well, the constructive discharge would be the termination, Your Honor. There's an adverse consequence that's less than a constructive discharge under a retaliation claim. It can be a change in pay, any change in status. And there were numerous cases we cited in our brief that talked about switching. If we find that didn't exist, if we find you did not, that's not present in this case, there's no evidence of it. If we find that, then the way she was actually terminated and the reason for termination as offered by the company, you don't challenge that. If I may, Your Honor, knowing that my time is up. Yes, sure. Your Honor, we do challenge the reasons why, the pretext argument I think is what you're saying, that the company came up with a valid reason why it could let her go. That was never argued below. It was never decided by the court below. They argued it below. They raised it below. And they raised it in their brief. It was not addressed by the district court. The court decided on the other two issues. We do believe that the pretext itself would be a factual dispute. Yeah, but stop. Stop for a second. Well, all the facts are already in the case, aren't they? All the facts? Yes. I believe all the facts and inferences are there. So then it's ripe for determination on pretext, too, isn't it? I don't think we want to go that way. Why isn't it? Your Honor, I believe that this court has said on numerous occasions that a pretext decision is also a factual dispute. In fact, intent itself is inherently factual. But all the facts are in the record. As are the inferences that can be drawn from them, Your Honor. I know, but we could still make it now, though. If the court was so inclined, yes, the court could. Okay. There's no limitation in this record from us making a pretext determination if we so desired, correct? You would think it might be wrong. You might not want it, but there's no legal limitation on us doing it. That's correct, Your Honor. Okay. Thank you. Thank you, Your Honors. Ms. Williams. Good morning, Your Honors. I'm pleased to be here today representing Development Alternatives, Inc. Can you lower the microphone just a bit? That's perfect. Okay. Thank you. Thank you so much. It has become apparent that the only issue before this court today is constructive discharge. Whether the factual situation was so intolerable that a reasonable person would have been forced to resign under the circumstances. And if so, if there was a but-for causal connection between the constructive discharge, I'm sorry, between the protected activity in this case, which Judge Titus did find, and the alleged constructive discharge. The case was decided the day after the Supreme Court decided Nassar, in which they imposed a but-for standard as applying in Title VII retaliation cases. Judge Titus was fully aware of the Nassar decision. He talked about it. When he issued his opinion, though, he reached the conclusion that he didn't parse the but-for standard, but he said that Ms. Rome had not been able to articulate that there was a causal connection between her protected activity and the decisions made by DAI in June that year. In looking at the Nassar but-for causation framework, is it dispositive from your perspective that there were legitimate business reasons given under that Donald Douglas shifting burden analysis that you articulated reasons sufficient to justify? Yes, Your Honor. There were substantial reasons, and there were substantial reasons six months after Ms. Rome came forward and complained. And was it the job timing, the fact that your company had contracts and stuff that were time sensitive and things of that nature? Yes, Your Honor. The nature of DAI's business is actually intensely relevant to the issues before the court in this case. Ms. Rome wasn't employed to sit in an office in a town to do a job for a number of years. She was employed by a worldwide development company that does economic and political work around the world for underdeveloped countries. They hire people and place them in countries generally for one to two years, occasionally more than two years. The particular contract that Ms. Rome was working on in Venezuela was originally slated to end in 2007. It was extended for a year into 2008, and towards the end of 2008, it was extended for another year. That year didn't get completed. There were political issues. I think one of the concerns I had was that it was always sort of unclear what her status was during June and July and August. I mean, if you're in a business, you've got to be able to plan and to know. I mean, people have legitimate medical reasons for taking off. My goodness, we all do. We all do. But you have to communicate in some sort of way about, all right, I want to come back. Here's what my plans are. And there's all this correspondence and things at the end of the correspondence are just as up in the air as ever. They were. She initially left for a number of weeks at the end of March. She was to return sometime towards the end of April. She sent an email and said that she would have surgery in the United States at the beginning of May. On May 13th, she wrote and said that she had been too ill to have the surgery and wasn't going to have it for another two weeks. In the meantime, DAI was flying substitutes back and forth from the D.C. area to work in Venezuela to replace her. Towards the end of May they had to. They had also offered Ms. Rome the opportunity to apply for FMLA, which she declined. She didn't apply for. So to the extent the law would impose that there's an obligation to apply job protection to hold a job open, it didn't apply in this case because she declined to apply for FMLA. There are cases set in our brief with regard to an employee waiving that right and therefore waiving the right to reinstatement. We alluded earlier to pretextual analysis. What's the difference between pretextual analysis and the Nassau but-for causation standard? The but-for causation standard is part of establishing the prima facie case. So to establish a prima facie case, she has to allege certain adverse actions. She has to show that there's a causal connection between her protected activity and the adverse action. We maintain that she can't establish a prima facie case, and she couldn't establish any causal connection, much less a but-for causal connection. If the plaintiff were able to establish that she could establish a prima facie case, then the burden shifts to the employer to articulate a legitimate business reason for its actions. In this particular case, DAI, though we did not get to that stage, articulated several legitimate reasons for its decision to place another person on the contract in Venezuela. Is there a difference between the pretextual analysis? No, it's part of the pretextual analysis. Once a prima facie case is established, the burden shifts to the plaintiff to show pretext. So the employer has to articulate a reason, and then the employee, the plaintiff, is required to show that the legitimate reasons to prove, not merely to articulate, that the legitimate business reasons are a pretext for illegal discrimination. So our position was there was no prima facie case established. Secondly, if she did establish a prima facie case, then DAI certainly articulated legitimate business reasons, many legitimate business reasons for its actions, and she could not establish that any of those were pretext. Bruce Fake, managing director Bruce Fake, gave several legitimate reasons. She wasn't able to return to work. As of middle of May, she said she hadn't even had the surgery. Let's talk about the but for causation as to the transfer. In it, except that she complained about her supervisor's conduct. That's not disputed for these purposes at all. No. Others in the company agreed that his conduct was not appropriate. They didn't, Your Honor. They didn't? No. They thought he was a paragon of virtue? They did not think he was a paragon of virtue. They didn't think that he had engaged in sexually harassing behavior. I said they didn't find his conduct to be completely appropriate. They found his conduct to be appropriate. So it was held up as a standard then what people should do in that company? There were many, many complaints that she had against Mr. Fernandez. As to take any of them, that's most likely. All of them are found with the company? No. Mr. Fernandez received a written warning that he had to calm down, that he had to get rid of his sense of urgency, that he had to quit yelling at people, that he had to quit being hard on people. There's a divergence between the two. By the way, he was not her supervisor. Rome has maintained throughout that they had equal lines of authority. She was in charge of operations. She complained to people above him, correct? No. She complained to her supervisor. Well, then in the chain of command, who's she supposed to complain about? Right. You encouraged her. Your company encouraged her to do that. Yes. It's absolute policy. She complained and then she was transferred. Isn't that correct? There were many intervening events, but yes. Okay. Then why isn't that some evidence of but-for? Why isn't that some evidence of but-for? You go and you complain about somebody and they're important. That person she complained about was very important to that office, wasn't he? He was. Right. You complain about a key player and suddenly you find yourself transferred. Why isn't that some evidence of but-for? Because of the many intervening events. Rome argued to this court, trying to apply a Seventh Circuit case, that we should look at the mosaic of evidence. If we look at the mosaic of evidence, DAI's response was to send somebody to Venezuela to talk to all the employees, to take the temperature of the office. There were many, many complaints, not just the hostile environment. Yeah, but why couldn't you do all that? You could do all that and still be retaliation for making the complaint. I suppose that's certainly true, Your Honor. But all the evidence is they took appropriate action. Not the evidence from her. The evidence from her is not they took the appropriate action. She quibbles with the actions that we're taking. She admits that a higher-level supervisor came down for a week and interviewed people. She admits that they did team-building exercises. She admits that a mentor was brought in. Wait, wait, wait. She didn't think what the company did was appropriate because didn't she think it, at least if it's not stated inferential, that she wanted him gone and she wanted to stay there? She wanted him gone and she wanted to stay there, yes, Your Honor. So she's not happy with the resolution of it. No, she's not happy. But there is substantial case law in this circuit that says that if the employer takes effective remedial action and it is as under the guidance of the Supreme Court. We're talking about retaliation, for retaliation now. We're not talking. Couldn't you take retaliation even if the company absolutely remedied the problem? Somebody complains, right. So retaliation is different than remedial action and all that, correct? Yes, absolutely. The company could take effective remedial action and still retaliate. So why isn't that but-for causation? She complained, her theory, this is her theory, and the facts. She complained and she got canned. Why isn't that enough for but-for, an inference of but-for causation? Because there's substantial evidence that the actions were taken for different reasons. There's an old Latin phrase, post hoc doesn't equal propter hoc. In other words, the fact that something comes afterwards doesn't mean that something, that what comes afterwards was because of something that went before. No, exactly. And I think the best explanation of but-for. But that same phrase doesn't mean something that comes later must be unrelated to something that came first. True, Your Honor. But there is a circumstance in which every time somebody complains of retaliation. Make your best argument on the facts to she complained about her. You accept the fact she complained about this person, don't you? She complained about the person. It was her job to complain about the person. She was head of operations. She complained and she was later asked to leave that position, correct? Yes, Your Honor. Why is it, make your best argument factually that that isn't at least evidence of retaliation. She worked through March and there were several measures taken by the company. She went on vacation. Her job was not eliminated. She was expected to come back. She extended her leave. Her job was not eliminated. She was expected to come back. In the middle of May, when we're looking towards flying the third replacement down to Venezuela, she says, I'm too sick to have the surgery. I can't have it yet. We have emails starting. We need to address this situation. What's going on? She's not able to return. They're flying still another person down to replace her. And, and. If she had been able to return, would they have taken her back? Yes. There's no evidence that they wouldn't have. It is true that people like Darren Upton Kosulich better, they thought that she was better suited to the office. But if she had wanted to come back in March or whatever, she would have been taken back. Yes, she would have been taken back. In Venezuela? Yes, her job was there. Her apartment was there. They were, they had flown in somebody as a replacement who Ms. Upton Kosulich had to leave in May. She was, she was flown in as a temporary replacement. Yes. She wasn't, they weren't even, she wasn't even flown in as a permanent replacement. She was flown in as a temporary. As one of three during the course of the weeks. And it was only after she'd been on the, on the temporary replacement status and had worked out from all accounts well with Fernandez that they decided to go with that. And two things happened. One, the temporary replacement was, came in and worked out very well. And the second thing that happened was it wasn't clear when Rome was going to come back. And, and the correspondence is simply fuzzy. You just can't get a grip on what the status of things is. Now, you know, you can agree or disagree with the company's actions. You can say, well, the company should have held the job open for her longer. The company should have been more diligent in trying to, I mean, the company should have waited longer, have, shouldn't have been so quick to do what. But all of that doesn't mean that they retaliated against her for complaining. It's a combination of they couldn't get a grip on what her status as an employee even was. And they had a temporary replacement who had come in and actually proven herself on the ground. Most of these retaliation cases don't have those kinds of, those sorts of factors. You don't have a temporary replacement coming in and working out well. And you don't have a situation whose medical condition is in continued doubt. And as I say, you might disapprove of what the company, how the company operates. But it's hard to see how that's retaliation. Precisely so, Your Honor. And we add to that Mr. Spake's testimony, Managing Director Spake, that said, I offered her a job anywhere in the company. We've got five to ten contracts opening up every month. I can't tell her exactly where I would place her because I have no idea. That's why I want to go back to that. You contend that at any point in this fact scenario, she wanted, if she wanted to go back to Venezuela, she would have been put in Venezuela? Mr. Spake, when asked that question in his deposition, said, I absolutely made no decision she couldn't go back there if that's what she wanted. I would have been surprised because she was deeply unhappy. No, I'm not asking if he hadn't decided she couldn't go back there. I'm asking, could she have? Is it clear on this record, if she wanted Venezuela, she could have had Venezuela? That's not clear on this record. That's not clear on the record. The question was never asked. I see no reason why that wouldn't have been. And that question was asked of Mr. Spake. And he said, I absolutely did not make a decision she couldn't go back to Venezuela if that's what she wanted. Don't the facts give a reasonable inference that because her replacement had been hired, she couldn't go back? Isn't she entitled to that? Possibly. Wait a minute now. Her position, they brought in the temporary, the temporary did a good job, and what? Then she could have had, what, she'd have bumped the replacement out? Isn't she entitled to at least the inference that her job in Venezuela had been filled and it wasn't available for her? I think on the facts, that's a clear inference, isn't it? I suppose it's an inference, but it certainly isn't a fact that was established on the record. It was a question she never asked. They tried to contact her. It had to be a reasonable inference is all. Isn't that correct? I suppose it's not inappropriate to make that inference. But Mr. Spake, it's inappropriate to make that reference. But Mr. Spake did promise her that he would help her find a job anywhere in the world. And that was the nature of DAI's business. You know, as I know, just to find another job doesn't necessarily match up with no adverse action towards you, correct? Understood, Your Honor, but she acted precipitously and didn't allow him to make that decision. That particular issue has been looked at most recently by this court in April of this year with regard to somebody walking off a job precipitously because there wasn't a reason to do that in the Freeman case. And in 1991, there was precisely the same decision. Is it your view, like the judge, that since she didn't know what job she would have gotten, he can't compare? That's the nature of DAI's business. Nobody knows what job they can get. And I think he's completely right that she didn't give DAI. If we're going to make adverse inferences against DAI, you have to allow DAI the opportunity to prove that it's a bad company. I don't think that's right at all. Is there any reasonable inference in this record that had she been in Venezuela, she liked her job, hadn't complained, that they would have moved her? Is there any inference in the record at all? She wouldn't have been moved if she had come back to work after her vacation. No. She wouldn't have been moved. There's no inference then that DAI takes you from a job you're performing and that you like and just moves you somewhere else on a one-off contract. No, absolutely not. You're not entitled to that inference, that anybody might be moved anywhere. Her case is she liked a job in Venezuela, she complained, and the company, there are reasons maybe why, but the company replaced her in Venezuela and there was no job for her in Venezuela. The company replaced her in Venezuela when she was too sick to come to work for three months. I said there are other factors. You might win on those factors, but it doesn't seem to me you can argue that the facts, at least the reasonable inferences, as I set them out for you, she was working in Venezuela, she complained about Mr. Hernandez, correct? She did. It was her job. Or Fernandez maybe. And by the way, didn't somebody in the HR office think that Fernandez had created a hostile work environment? At least one person for your company. There was an inexperienced employee relations manager who wrote a memo. She gave it only. Would the answer be yes or no? It would be yes, but her boss said no, you're wrong, that's not the way it works. She has the burden of creating not just a speculative case with respect to pretext, but a genuine issue. A material fact over pretext. And that correspondence, there's no indication in the record that your job is not available for you. The correspondence is what it is. It's iffy, it's tentative. Also, it's undisputed that the temporary replacement worked out exceedingly well. It's undisputed that there were time-sensitive contracts that required a sense of business planning and a sense of predictability about who the personnel on the ground would be. In Venezuela, most of these retaliation cases are just a lot stronger in terms of temporal connection and also the other reasons offered by the company before us. But in this case, it's backed up by a lot of evidence in the record. May I make two more facts? She was asked to contact the company and they would help her. She never did that. She abandoned it. And secondly, she testified in her deposition that she always intended to come back, and I apologize, I've gone over. But she testified she intended to come back. She felt she had the job. She felt the job was open. At DAI, yes. And she testified that she, after the June 12th conversation with Mr. Speck, always intended to come back. She just didn't look at ads. She didn't look at postings. She didn't call anybody. She didn't apply for anything. And she remained on the payroll as an inactive employee for months. There has to be some communication between people when you really have a business with time-sensitive nature. Did they fly in three temporary replacements? Yes. Two quick questions on the e-mails. The May 5th e-mail that essentially said that she would be replaced or that Upton would become the Venezuela, what was the purpose of that one? That was an e-mail from a colleague to Ms. Roem. Ms. Roem was initially intended to return by May 5th, and when she couldn't return they announced that Aaron Upton Kosulich was going to be a replacement for an extended period of time. Not a permanent replacement at that time? No, not until June. And the discussion only started after Ms. Roem sent an e-mail on May 13th that said, I'm too sick to have the surgery, I'm not even having surgery for two more weeks. That's when the discussion about replacing her on that contract started. And then you had a May 20th e-mail that said she wouldn't be coming back. What brought DAI to that conclusion? After her May 13th e-mail, which is cited in the same section, I think it's in the Joint Appendix at 1166, where she sent an e-mail on May 13th that said, I'm too sick to have the surgery. Mr. Fernandez's boss sent on an e-mail to Human Resources and said, we really need to talk about this as it's becoming urgent. So the first discussions about a permanent replacement were after she sent the e-mail of May 13th. The company tried to find out what her situation was. Yes. And when she could return. Yes. They were trying to find out, what's the deal? Exactly. Thank you. Mr. Wallace. Thank you, Your Honor. Just to clarify a few things, Your Honor, that all of you asked, I thought were very important and things that we need to look at in terms of the facts. One of the most important things that I think there's a little bit of misdirection going on here is that DAI sent an e-mail, we attach an e-mail here, on April 29th, less than a month after Ms. Rome leaves Venezuela. When she's still intending to come back before she has any health issues at all, before DAI even knows about the health issues. And they say, we're talking about replacing her with Ms. Erin Upton-Kosolich. That's clear. And Mr. Godfrey, who was the supervisor for Ms. Rome at that point in time. Then the e-mails after that follow along that Ms. Upton-Kosolich was clearly intended to be the replacement of Ms. Rome. And they were not intending to let her know to come back. She has her plane tickets, which are an exhibit in there, purchased on May 5th or 6th. Coming back at the beginning of June. There was never any issue, question at all about the fact that she would be coming back. She didn't find out that she wasn't allowed to come back until Mr. Spake told her, things aren't perfect for you anymore. Don't go back to Venezuela at that point in time. Your Honor, I would agree with you that things are fuzzy. I think fuzzy, when you're talking in a summary judgment world, that certainly means that it at least goes to a jury at that point in time. But I don't even think that it's fuzzy. Her status. I agree. Not her status. Her willingness to come back. Her willingness to come back. And the fact that there's no communication and there's no clarification as to when I'd like to come back, when I can. I mean, it's just – I agree, Your Honor. And the company was working with her through that. They clearly – all the email correspondence shows that. In addition to all that, what we have – Why would they even do that if they had no plans to bring her back? She was a model employee, and there's another reason why, too, Your Honor. One of the reasons was Ms. Channer made very clear in her email correspondence with Ms. Rome that I sympathize with you. She said this in May when she's going back and forth telling her about her long-term disability, the short-term disability. She says, I sympathize with you in this case. I want you to know I feel the same way, but I had no influence in the end. That's item number one. Item number two was given to us by Mr. Fernandez, not only in his deposition testimony when he said how things were great once she was gone, they were able to get on doing what they want, but when he found out that she was coming back, he sent a crystal-clear email. It couldn't have gotten better from a plaintiff's perspective in terms of demonstrating that this was the reason why they were letting her go, it was because of the havoc that he created, that she created in terms of ratting him out. She said, is Heather coming back to the project? This is what Mr. Fernandez said. Please, it took me a lot of work to fix the office. We're facing a great amount of work in the next months. The last thing I need is, again, chaos and disobedience. Your Honor, when you mentioned the whole idea about does the pretext analysis and the but-for analysis start to merge, they do at some point in time. I think that is clear evidence not only of the fact that there is a direct correlation to the reason why they let her go, but there's a direct correlation to show that there's a definite pretext here. There is a clear evidence of the fact that they intended to let her go because she raised havoc for him in that office. She came forward and ratted out what she saw was horrible conduct, which HR agreed was horrible conduct, whether it was a lower-level person or not. You argue that they made the choice to pick somebody who's economically important to them over her. Don't you make that argument? They did in the end, Your Honor. Well, is that not a justification? You may not like it. I may not like it. You may like it. I may like it. But that's a justification other than something she did. The company just looked at it and said, it's best for us. You argue this to keep him. Your Honor, I don't know that that is the only reason. I think that's what the pretext analysis is about is trying to establish all of the reasons why the company did what they did. The problem is you can really disapprove of a company's business practices, and you can really disapprove even of Fernandez's conduct. And as Judge Wynn said, he's no saint, and nobody's contending that he is. So you can disapprove of Fernandez's conduct. You can disapprove of the way the company's business model operates. You can disapprove of whether they should have brought in Ursulic or whatever her name is or whether they should have brought in the other people. You can disapprove of their response to the situation and whether they should have sent different people down to Venezuela or more people down to Venezuela and everything. You can dispute the medical evidence and the rest, but it still doesn't get you to the point where they discharged her because of a complaint. That's the point is that there are all sorts of allegations about Fernandez and about what the medical situation was and what the nature of the contracts were and how many replacements came in and whether the other people got along or whatever. But as much as you might disapprove of this person or this company, it doesn't mean that the reason that she was discharged was because of the complaint. Your Honor, I believe that part of the analysis is when you're looking at a pretext, we don't merely accept the fact that they said that it was for business reasons. We look at those business reasons, A, to find out if they're truthful and honest, and B, not all business reasons. I'm sorry. The point is once you complain, you are protected against retaliation, and that's absolutely key under the law, but you don't wear complete armor. You're not completely immunized from discharges that are grounded in legitimate business practices and everything, and so the task for us is to find a balance because, yes, you definitely have a protection against retaliation, but you don't have a protection against anything ever happening to you for any reasons, which are independent of the complaint. And these medical reasons and the team chemistry and the nature of the business, all those are independent. The nature of the contracts, the time sensitivity of it, the number of places that they had in Venezuela for senior staff, all of those things are simply independent of the complaint. Your Honor, I think that's the key issue here. Were they truly independent? I think Mr. Fernandez made it pretty clear that they were not independent. The reason they got rid of her, the reason they put Ms. Kustelich in there, was for that reason. Thank you, Your Honor. Thank you. We'll come down in Greek Council and move into our final case. Thank you.
judges: J. Harvie Wilkinson III, Dennis W. Shedd, James A. Wynn, Jr.